**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------- X

CROSS MEDIAWORKS, LLC,                              :
a Delaware Corporation, and                         :
TELAMERICA MEDIA, LLC,                              :
a Delaware limited liability company,               :
                                                    :
                              Plaintiffs,           :
                                                    :         No. 14 Civ. 561 (VSB)
          -v-                                       :
                                                    :
EMT HOLDINGS, LLC, a Georgia limited               :         DEFENDANTS' SECOND AMENDED
liability company d/b/a EMedia Trade, and          :         COUNTERCLAIM OF DEFENDANTS
EMT & S INCORPORATED, a Nevada                     :         EMT HOLDINGS, LLC AND EMT&S,
corporation a.k.a. Electronic Media Trading &      :         INC.
Services, Inc., and JOSEPH LEONARD                 :
FABIANO III, an individual,                        :
                                                    :
                              Defendants.           :
                                                    :
                                                    :
-------------------------------------------------------- X

   Defendants and Counterclaim Plaintiffs EMT Holdings, LLC d/b/a eMediaTRADE and

EMT&S, Inc. d/b/a Electronic Media and Trade Services, by and through their attorneys, assert

the following Counterclaims against Plaintiffs and Counterclaim Defendants Cross Media

Works, LLC and TelAmerica Media, LLC:

**JURISDICTION AND VENUE**

   1.   This Court has supplemental jurisdiction over this case pursuant to 28 U.S.C. §

1367.

   2.   Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(2) and (3).

**PARTIES**

   3.   Counterclaim Plaintiff eMedia is a Georgia limited liability company with is

principal place of business located at 11800 Wills Road, Suite 150, Alpharetta, GA 30009.

4.      Counterclaim Plaintiff EMT&S is a Nevada corporation with its principal place of business located at 11800 Wills Road, Suite 150, Alpharetta, GA 30009.

5.      Counterclaim Defendant Cross Media Works, LLC ("CMW") is, upon information and belief, a Delaware limited liability company with its principal place of business located at 499 7th Avenue, 6th Floor, New York, NY 10018.

6.      Counterclaim Defendant TelAmerica Media, LLC ("TelAmerica") is, upon information and belief, a Delaware limited liability company with its principal place of business located at 499 7th Avenue, 6th Floor, New York, NY 10018.

## FACTS & GENERAL ALLEGATIONS

### Background and Basis for the Project

7.      The parties have done business together amicably for years.

8.      Between the years 2003 and 2010 the parties worked on at least seven projects together. The parties executed written contracts for these projects. The project at issue in this case was to be no different.

9.      On or about August 29, 2011, Larry Rubin and Tom Weber of CMW contacted eMedia's Chief Executive Officer, Joe Fabiano, about a project CMW was working on with its subsidiary in Arizona, Apex Media Sales, LLC ("Apex").

10.      CMW and Apex were developing a software program, Cross MediaWare ("CMWare"), to replace a previous system named Conan, which had become obsolete.  At that time, CMW needed outside help to complete CMWare and make it useful for its purposes.

11.      Due to a conflict arising with CMW's management, the CMW in-house development team resigned.

12.     CMW requested eMedia to travel to Arizona and interview the departing developers before they left, so that eMedia could ascertain the status of the CMWare development.

13.     CMW asked eMedia to evaluate CMWare and the current status of the development project and to propose a plan to salvage the project and complete the development of the software, while keeping costs to a minimum.

14.     This evaluation occurred quickly after CMW contacted eMedia, because of the speed in which CMW's internal personnel were departing.

15.     CMW agreed to pay $100,000 to eMedia for its work evaluating CMWare.

16.     Without being required to sign an NDA, eMedia performed the analysis, which included spending numerous hours interviewing employees about the current status of the CMWare project and the specific needs required by CMW and Apex.  After eMedia's analysis was complete, it prepared a proposal to CMW for the completion of CMWare.

17.     eMedia proposed four options to CMW on October 5, 2011 in New York at CMW's headquarters. A true and accurate copy of the proposal is attached hereto as *Exhibit "A"* and the four options are  summarized as follows:

      a.   The first option was described as the "Apex Conversion Only – Time and Materials or Fixed Price" option. With this option, eMedia proposed to train CMW's new development staff, who would take over the project once the conversion to CMWare was complete. The cost proposed by eMedia was $195,000 per month for seven and a half months or $1.5 million in estimated time and materials. Alternatively, CMW could choose to pay a flat rate of $1.6 million.

b. The second option was described as "Total Project Bid – Apex Media and All Units." With this option, eMedia proposed to build and deploy the systems over a period of eighteen months to two years. Then, at the "appropriate time" CMW would create an in-house development team that would then continue working without eMedia's support. The cost for this option was proposed to be $2.85 million.

c. The third option was described as "Management only of an In-house team." Under this option, eMedia proposed to externally manage CMW's employee development team, and to provide CMW's leadership with "status reports." The proposed price for this option was $70,000 per month, $800,000 for one year, or $1.5 million for two years.

d. The fourth option was described as the "Licensing Model." Under this proposal, eMedia proposed to build a platform to compete with other vendors in the same market as CMW, and to sell to third parties. It was to be an investment on CMW's part. The proposal states that eMedia would "do this development under very similar terms to the agreement we did with you last year for the MXD license." Further, eMedia proposed that CMW would "own a source code license to the platform…In addition, [eMedia] will revenue share back with [CMW] up to $1M of the development costs towards offset of [CMW's] investment." The proposed cost for this option was to be $3 million of development, which would give CMW a license "similar to the one [CMW] already negotiated" on deals during the prior year. CMW would also receive

4

"market-based annual support & maintenance fee…to be billed on a monthly basis."

18.     CMW agreed to the "Licensing Model" option, and a significantly reduced price for a license to the software in exchange for eMedia's ownership and rights to use and market the intellectual property ("IP") resulting from the development project.

19.     CMW and eMedia continued to discuss the monthly fees, and on or about November 14, 2011, agreed to the fee arrangement of $100,000 per month for outside programmers and contract programmers at fixed hourly rates.

**The Parties Negotiate Contract Drafts**

20.     As in all their previous projects together, eMedia wished to enter into a written contract for the CMWare project. eMedia began preparation of a Master Services Agreement ("MSA") and an associated Statement of Work ("SOW"), expressing the agreed-upon material terms, and the accompanying boilerplate.

21.     And so in November of 2011, the parties began to exchange drafts of an MSA and SOW revolving around the agreed upon terms.

22.     Between November 2011 and January 2012, the parties exchanged numerous drafts of the SOW.

23.     Most of the revisions between November 2011 and January 2012 involved the "Estimated Deliverable Timelines" provision and the structure of the IP ownership provisions. The fees and costs provisions remained constant at a discounted development price, reflecting the lower rate due to eMedia's ownership and use of the IP.

**Contract Negotiations: The Shifting Estimated Deliverable Timelines**

24.     Even in contract negotiations, the estimated timelines for completion was a moving target, ranging from March 3, 2012 to April 6, 2012.

25.     The timeline for the project was set forth in the "Estimated Deliverable Timelines" provision of the SOW.  In one of the first iterations of the SOW on November 30, 2011, eMedia proposed an estimated completion date of March 30, 2012 for the CMWare project.

26.     On December 28, 2011, CMW sent a draft of the agreement to eMedia in which it changed the estimated completion date to March 3, 2012.

27.     Two days later, on December 30, 2011, eMedia revised the SOW to provide an estimated completion date to April 6, 2012.

28.     CMW proposed at least two more sets of revisions in January, 2012, and kept the April 6, 2012 estimated completion date in those revisions.

29.     Furthermore, in every draft of the SOW, CMW was required to cooperate with eMedia and provide accurate, timely responses to eMedia's requests for information, equipment needed, and software licenses needed to complete the project. For example, the January 6, 2012 draft of the SOW from CMW states, in pertinent part:

> 9) CLIENT'S ONGOING COOPERATION AND APPROVAL.
> The services to be provided here under by Vendor are contingent and dependent on Client's timely cooperation, approval and participation in portions of the Project.  Vendor shall not be responsible for any delays caused solely by Client's failure to provide required approvals & information; provided that Vendor makes such requests for approvals and information in writing to both Client Project Managers and inform the Client Project Managers the timeline impacts delays which may be caused by delays in receiving such approvals and information.

(January 6, 2012 draft of SOW from CMW to eMedia.)

30.     Additionally, the estimated timeline was based on accuracy of certain assumptions, including prompt decisions on items such as Initial Requirements, and provision of appropriate versions of legacy software upgrades.

31.     Without meeting those assumptions, the estimated timelines could not be satisfied.

**Contract Negotiations: The Provision Related to
Ownership of the Intellectual Property Changed**

32.     After agreeing to a framework for the IP ownership in the proposal, the parties exchanged multiple drafts of the SOW regarding the specific terms of the ownership, use and investment of the finished software product and related services (the "Client Deliverables").

33.     The general concept remained the same – eMedia would have the rights to use and resell the code, and CMW would have the ability to use it in its business – though the parties continued to discuss the best mechanism to accomplish their agreement.

34.     For example, in the initial draft of the SOW, which closely reflected the parties' verbal contract, eMedia owned the code and granted CMW a license to it. In several later versions of the SOW, based on CMW's revisions, the parties included language that CMW would own the source code and grant eMedia a perpetual license to do whatever it saw fit, including marketing it.

35.     In still later versions, the parties discussed joint ownership in a newly formed company, which would grant a license to CMW and market the Client Deliverables under a new trade name.

36.     All of the versions maintained the agreed-upon material terms that CMW would be permitted to use the code in its business, and eMedia would be able to market and sell the code to third parties.

37.     There were several other key provisions in the SOW that remained unchanged in the written drafts.

**Contract Negotiations: The Cost and Fee Provisions
Remained Unchanged in the Drafts**

38.     The cost and fee provisions remained static in all of the revisions of the SOW. Those provisions state that the pricing includes two types of resources, fixed cost resources and variable cost resources.

39.     The fixed cost resources as set forth in all revisions of the written contract are set at $100,000 per month to develop the CMWare product.

40.     The variable cost resources as set forth in all revisions of the written contract are detailed in a chart and reflect the hourly rates of eMedia's employees.

41.     Even after many drafts of the SOW were exchanged, none were ever executed.

**CMW Requested eMedia To Work Immediately, Even
Without a Written Contract**

42.     Despite the fact that no written contract had been executed, CMW requested that eMedia begin work on the items listed in the Initial Requirements document that was attached to the SOW drafts.

43.     On November 17, 2011, at CMW's request and based on CMW's acceptance of the proposal and the parties' longstanding relationship, eMedia started development work on CMWare.

44.     During the development process, eMedia stopped work twice due to CMW's refusal to sign the MSA and SOW. However, after getting assurances that CMW agreed to the material terms and would sign the documents, eMedia resumed work.

45.     eMedia provided continuous status updates, which included ongoing, timely feedback on the current project status.

46.     The status updates included:

a.  Detailed weekly project status reports from eMedia project managers sent to all team members, including CMW's Chief Information Officer, Tom Weber, from the beginning of the project through eMedia's end of work;

b.  Daily "scrums" – brief updates – to which the following people attended:

   i.   eMedia's V.P. of Product Development (Jamie Meyer),

   ii.  eMedia's Project Manager and Analyst (Mark Hilden),

   iii. eMedia's Project Manager Jody Tester (after he took over as project manager for Mark Hilden),

   iv.  eMedia's analyst (Steve Burgess),

   v.   CMW's analyst (Valerie Castelano),

   vi.  eMedia's lead developers (Jeff Blair and Rohit Sankholkar),

   vii. CMW's developers (Fred Taylor and Dave Southworth),

   viii. CMW's Quality Assurance Lead (Yana Morford), and

   ix.  CMW's Quality Assurance Analyst (Iram Qureshi).

Weber was invited to every "scrum" but never attended;

c. "Sprint Planning Meetings," held at the beginning of each two-week sprint, the same people who attended the daily scrum meetings each day also attended these meetings.  Again, Weber was invited to every meeting but never attended;

d. "Sprint Review Meetings" held at the end of each two-week sprint. Those listed in the above meetings regularly attended the Sprint Review Meetings, plus various business leaders attended the meetings when eMedia had something to demonstrate to them in their area of responsibility. Again, Weber was invited to every meeting but never attended any Sprint Review Meeting;

e. Written reports of meetings were provided to Weber within three days of each meeting;

f. All progress was maintained on the Team Foundation Server ("TFS").  All CMW team members, including Weber, had full access to the TFS system.

g. Beginning on February 2, 2012, eMedia's Mike Miller began sending monthly status summary reports to Weber that included a summary of the progress and any outstanding delays and project impediments.

**CMW's Delays**

47.     Even before eMedia commenced work on CMWare, the project ran into delays caused by CMW.

48.     Even though the parties agreed to a list of Initial Requirements for tasks to be completed, on November 11, 2011, Jonathan Batt, CMW's Chief Financial Officer, informed eMedia that he rescinded his written approval of all of the financial requirements, and that they all needed to be redone.

49.     Batt's rescission deeply jeopardized the project and substantially delayed the project completion date.

50.     Joe Fabiano informed Rubin, Batt and Weber via conference call of this significant development on November 14, 2011.

51.     The process of gathering and documenting the new financial requirements took over three months to complete.  Even so, only a small number of minor financial requirements were approved by the financial management team and submitted to the project team for estimation of programming and testing effort.

52.     CMW did not ultimately approve the next set of financial requirements until March 13, 2012 - one day before CMW now claims it wanted the project to be complete. However, even at that point, there were still some significant financial requirements that were yet to be documented by the CMW staff.

53.     eMedia never had an opportunity to estimate the size and relative priority of these new financial requirements.  On information and belief, CMW's new requirements would most likely have more than doubled the timeline and cost estimates to complete the project.

54.     The substantial delay described above was not the only delay that was caused by CMW.  For instance, CMW's hardware constantly went down and locked eMedia's team out of the system.

55.     One of the key functions of CMWare was that it integrate with the Great Plains financial software. CMW provided access to a test copy of an outdated version of Great Plains, but it did not contain data to test. Live or properly simulated CMW specific data was crucial to determine functionality of the system. This was never provided during the entire duration of the project. This is one example of how CMW failed to cooperate in the execution of the project.

56.     Then, during the development, CMW began upgrading to a new version of Great Plains, which changed the integration requirements. CMW never provided eMedia with access to the correct or updated version of Great Plains, despite insisting that CMWare integrate with it, and despite eMedia's numerous requests. This is another example of how CMW failed to cooperate in the execution of the project.

57.     On January 6, 2012, a major power failure occurred in the Phoenix office of Apex, causing several days of delays.

58.     eMedia repeatedly requested an additional development server, to create redundant development and test environments and protect against hardware failures.

59.     Hardware failures occurred on multiple occasions, which delayed the project by several days. eMedia eventually had to put up its own equipment, at its own cost, to host the application and development environment reliably.

60.     CMW also failed and refused to provide software licenses for several required tools. As a result, eMedia was forced to purchase, at its own expense, its own licenses for Visual Studio, TFS, GoToMeeting, and Testing Tools.

61.     All the delays CMW caused put the project behind schedule.

62.     eMedia kept contemporaneous detailed records of time its developers and contractors lost due to CMW's delays.  The total amount of time lost on the project was 3,380.40 hours, or about 40% of the time spent on the project.

## The March 14, 2012 Meeting

63.     On Wednesday, March 14, 2012, CMW's representatives met with eMedia's representatives at CMW's headquarters in New York.

64.     eMedia's representatives were led to believe that the purpose of the March 14, 2012 meeting was to demonstrate the product in its then current state of completion.

65.     At the March 14th meeting, CMW's Chief Operating Officer, Larry Rubin, expressed anger and frustration that the project was not yet complete.

66.     During the meeting Mr. Rubin cursed at eMedia's representatives, told them to immediately stop work on the project and stormed out of the room.

67.     After the March 14th meeting, eMedia discovered that Rubin was not aware of CMW's delays and the revised schedule, even though the status reports were continually provided and readily available to CMW senior management.

**eMedia's Continued Work at CMW's Request**

68.     Despite Rubin's demand that eMedia cease work, CMW's Chief Information Officer, Tom Weber, and its Chief Financial Officer, Jonathan Batt, urged eMedia to continue to work on the project in order to prepare it for a transition back to CMW development personnel. They also told eMedia to continue to submit invoices for work on CMWare during that process.

69.     In reliance on the urgings and assurances of Messrs. Weber and Batt, eMedia kept working on transitioning the project and billing CMW after March 14, 2012.

70.     Thereafter, the parties began to negotiate a new agreement to cover the new scope of the changed services. The parties circulated several drafts of a new written contract, but the parties could not come to a final agreement.

71.     At Weber and Batt's request, eMedia continued to work on the project documentation and on updating the project data in TFS to allow a subsequent development team to easily pick up the project. Batt warned that Rubin was very angry and to continue working was risky. Weber subsequently insisted that the fees for the final weeks of work would be paid.

72.     eMedia sent CMW invoices for the work completed prior to the March 14th meeting, and for the work completed after March 14th per Weber's and Batt's requests.

73.     In spite of the assurances made by Weber and Batt that CMW owed money and would pay eMedia for the work it performed, CMW has refused to pay eMedia's outstanding invoices.

74.     CMW has received and retained great benefit from the work eMedia performed, even though CMW has not paid eMedia in full.

75.     CMW also used the source code eMedia wrote and finished out the project on its own. Upon information and belief, CMW is now using this software in its daily operations.

### Damages to eMedia

76.     The invoices CMW has refused to pay to eMedia are outlined as follows:

| Invoice Number | Due Date | Amount Owed |
|---|---|---|
| March 19 2012 | 3/12/12 | $44,337.00 |
| CMWProj 3.30.12 | 04/30/12 | $86,000.00 |
| CMWPersonnel 3.30.12 | 4/30/12 | $60,549.25 |

77.     CMW has failed and refuses to pay $190,886.75 in eMedia's outstanding invoices for work on the CMWare project.

78.     As a result of its failure and refusal to pay, CMW also owes interest to eMedia at the statutory rate of nine percent (9%) per annum from the dates the sums were due.

79.     Furthermore, eMedia rightly owns the intellectual property to the CMWare software. Since CMW refused eMedia access to the source code, eMedia was forced to start afresh and employ its own developers to redevelop the Google code to support new customers and new businesses. eMedia's cost to re-develop the software was approximately $2.5 million.

80.     Additionally, CMW's failure to allow eMedia access to the code caused a delay to eMedia in getting the new product to market. Those delays cost eMedia several million dollars.

81.     Due to CMW's failure and refusal to pay eMedia, eMedia was compelled to hire attorneys and bear the expense of attorneys' fees and the expenses of litigation.

82.     CMW has refused payment in bad faith and their refusal has caused great financial harm to eMedia's business.

**Services EMT&S Provided to TelAmerica and Associated Damages**

83.     In a separate agreement, eMedia's sister company, EMT&S, had a maintenance agreement with CMW's sister company, TelAmerica.  The agreement covered the purchase of and the associated maintenance services for a copy of eMedia's MXD system that TelAmerica purchased from eMedia as part of a previous project.

84.     This separate agreement had no relationship to the CMWare project.

85.     Section "14. Maintenance, Support and Training" of the EMT&S / TelAmerica agreement sets forth two (2) separate services that EMT&S provided to TelAmerica in conjunction with the purchase of the system.

86.     Each of these services was to commence on the execution date of the agreement, which was March 2, 2010.

87.     The first service was for a dedicated eMedia employee or contractor to provide "Port Development" services exclusively for TelAmerica.  This developer was to complete the development of the MXD Port (as described in detail within the agreement) until it was complete or until TelAmerica terminated the service with thirty (30) days' notice.  The price for this service was $8,750 per month in arrears.

88.     The second service was monthly maintenance and support of TelAmerica's purchased copy of the MXD product.  This service was to be provided for a period of twenty-four (24) months from the execution date of the agreement.  The price for this service was a fixed price of $25,000 per year to be paid in monthly installments of $2,083.33 in advance.  The agreement provided that the service could be terminated by giving 30 days' notice.

89.     Since CMW's relationship with eMedia deteriorated, on or about June 1, 2013 TelAmerica stopped paying its monthly invoices to EMT&S without notification or explanation.

90.     TelAmerica did not cancel or otherwise terminate the maintenance contract, as required by the agreement, until October 2013, at which point eMedia stopped generating new invoices for these services.

91.     TelAmerica has failed and refused to pay for services EMT&S continued to provide up through the time the agreement was terminated.

92.     TelAmerica has received and retained substantial benefit from the services EMT&S provided, despite failing and refusing to pay EMT&S in full.

93.     The invoices TelAmerica has failed to pay are outlined as follows:

| Invoice Number | Due Date | Amount Owed |
|----------------|----------|-------------|
| 5013 | 6/1/2013 | $2,083.33 |
| 5014 | 7/1/2013 | $8,750.00 |
| 5015 | 6/1/2013 | $2,083.33 |
| 5062 | 7/1/2013 | $2,083.33 |
| 5063 | 7/31/2013 | $8,750.00 |
| 5064 | 7/1/2013 | $2,083.33 |
| 5117 | 8/1/2013 | $2,083.33 |
| 5118 | 8/31/2013 | $8,750.00 |
| 5119 | 8/1/2013 | $2,083.33 |
| 5130 | 9/1/2013 | $2,083.33 |
| 5131 | 10/1/2013 | $8,750.00 |
| 5132 | 9/1/2013 | $2,083.33 |

94.     TelAmerica has failed and refused to pay $51,666.64 in EMT&S's outstanding invoices.

95.     As a results of its failure and refusal to pay, TelAmerica also owes interest to EMT&S at the statutory rate of nine percent (9%) per annum from the dates the sums were due.

96.     Due to TelAmerica's failure and refusal to pay, EMT&S was compelled to hire attorneys and bear the expense of attorneys' fees and the expenses of litigation.

97.     TelAmerica has refused payment in bad faith and its refusal has caused great financial harm to EMT&S' business.

**Count I: Breach of Contract**
**(eMedia against CMW)**

98.     eMedia and EMT&S reassert and reallege the preceding paragraphs as if fully set forth herein.

99.     eMedia and CMW had a valid and binding contract for the development and completion of the CMWare software program.

100.    In addition, the parties agreed that eMedia would have a proprietary right to market the code and that eMedia would market the code, sell it to third-parties, and derive proceeds from licensing the code and related services.

101.    eMedia performed its obligations under the contract.

102.    CMW breached the contract in many ways, including but not limited to:

   a.  refusing to allow eMedia access to the source code and to the Great Plains financial program;

   b.  failing to provide suitable, reliable hardware which caused eMedia to put up its own hardware to host the application and development environment;

    c.   failing to employ reasonable diligence and effort to respond to eMedia's requests for information;

    d.   failing to cooperate in the execution of the project;

    e.   refusing in bad faith to compensate eMedia for its services; and

    f.   refusing to provide eMedia with the developed code to allow eMedia to market and sell to third parties.

103.    Further, CMW's failure to provide access to the code in direct contravention of the contract forced eMedia to recreate the code, which caused delay and cost eMedia $2.5 million. The delay directly resulted in damages for lost sales during the delay period, and those damages are reasonably certain, directly traceable to CMW's breach, and were within the contemplation of the parties at the time the contract was made.

104.    As a direct result of CMW's breach, eMedia has suffered damage in an amount to be determined at trial.

### Count II: Breach of Contract
### (EMT&S against TelAmerica)

105.    eMedia and EMT&S reassert and reallege the preceding paragraphs as if fully set forth herein.

106.    TelAmerica and EMT&S had a valid and binding contract for MXD maintenance services.

107.    EMT&S fulfilled its obligations under the contract by performing the MXD maintenance services.

108.    TelAmerica breached the contract by refusing to pay EMT&S for the maintenance services it provided.

109.    EMT&S has suffered resulting damage as a direct result of TelAmerica's breach, the amount of which totals $51,666.64, plus interest.

## Count III: Account Stated
### (eMedia and EMT&S against CMW and TelAmerica)

110.    eMedia and EMT&S reassert and reallege the preceding paragraphs as if fully set forth herein.

111.    eMedia had an express account with CMW whereby eMedia provided development services and CMW paid for those services.  Up until March of 2012, CMW paid all the invoices eMedia tendered.

112.    CMW received the invoices after March, 2012 and failed and refused to pay.

113.    CMW failed to make an objection to the charges listed on the invoices within a reasonable period of time.

114.     EMT&S had an express account with TelAmerica whereby EMT&S provided MXD maintenance services and TelAmerica paid for those services.  Up until March of 2012, TelAmerica paid all the invoices EMT&S tendered.

115.    TelAmerica received the invoices after March, 2012 and failed to pay.

116.    TelAmerica failed to make an objection to the charges listed on the invoices within a reasonable period of time.

## Count IV: Quantum Meruit
### (in the Alternative to Breach of Contract of eMedia against CMW)

117.    eMedia and EMT&S reassert and reallege the preceding paragraphs as if fully set forth herein.

118.    eMedia performed a great deal of work on the CMWare project in good faith.

119.    CMW accepted and benefitted from all of eMedia's services and continues to use the code eMedia wrote for its CMWare software program.

120.    eMedia had a reasonable expectation to be compensated for its services, but it has not been paid in full for the work it performed.

121.    The reasonable value of eMedia's services it rendered to CMW that remains unpaid is $190,886.75, plus interest.

**Count V: Unjust Enrichment**
**(eMedia against CMW)**

122.    eMedia and EMT&S reassert and reallege the preceding paragraphs as if fully set forth herein.

123.    CMW has been enriched at eMedia's expense by accepting eMedia's services and retaining the code eMedia created then using it for its own purposes without paying eMedia in full.

124.    It is against equity and good conscience to permit CMW to retain eMedia's code without compensation to eMedia, because eMedia spent significant resources to develop the code for CMW without getting paid.  eMedia also spent significant sums of its money and manpower to re-develop the code once CMW refused to give eMedia access to the source code.

125.    eMedia has been damaged as a result of CMW's actions in the amount of $190,886.75, or in an amount to be determined at trial.

**Count VI: Unjust Enrichment**
**(EMT&S against TelAmerica)**

126.    eMedia and EMT&S reassert and reallege the preceding paragraphs as if fully set forth herein.

20

127.    TelAmerica has been enriched at EMT&S' expense by accepting EMT&S' MXD maintenance services without paying EMT&S in full.

128.    It is against equity and good conscience to permit TelAmerica to reap the benefit of EMT&S' because EMT&S provided services to TelAmerica, which TelAmerica used and benefitted from, and TelAmerica failed to pay EMT&S for those services.

129.    EMT&S has been damaged as a result of TelAmerica's actions in the amount of $51,666.64 or an amount to be determined at trial.

WHEREFORE, eMedia and EMT&S demand judgment as follows:

A.    That Defendants be awarded judgment on their Second Amended Counterclaims against Plaintiffs for:

      a.    Direct, incidental and consequential damages in an amount to be determined at trial;

      b.    An award of attorneys' fees and costs in an amount to be determined at trial;

      c.    Pre and post-judgment interest; and

B.    Such other and further relief as this Court may deem just and proper.

Respectfully submitted this 15th day of November, 2014.

Respectfully submitted,

/s/ Todd J. Poole_____
Todd J. Poole
Georgia Bar No. 583755
Kim Knight Perez
Georgia Bar No. 572125
Poole Law Group
315 W. Ponce de Leon Ave., Suite 344
Decatur, GA  30030
todd@poolelawgroup.com
jondavid@poolelawgroup.com
(404) 373-4008

*Admitted Pro Hac Vice*


/s/ Adam H. Russ

Adam H. Russ      [AR 2590]
Isaac Alony        [IA 4444]
Wasser & Russ, LLP
80 Maiden Lane, Suite 1502
New York, NY  10038
adam@wassruss.com
isaac@wassruss.com
(212) 430-6040


/s/ Luke Anderson

Luke Anderson
Georgia Bar No. 018330
Maxwell & Anderson LLC
1230 W. Peachtree Street
Suite 1900
Atlanta, GA 30309
landerson@maxwellandersonlaw.com
(404) 991-2241
*Admitted Pro Hac Vice*


*Attorneys for Defendants EMT Holdings, Inc.
and EMT&S, Inc*